# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**FREDERICK WATSON,**

<b>Plaintiff,</b>

-vs-                                            Case No. **6:05-cv-1647-Orl-JGG**

**COMMISSIONER OF SOCIAL
SECURITY,**

<b>Defendant.</b>

_____

# <u>MEMORANDUM OF DECISION</u>

Plaintiff Frederick Watson ["Watson"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for a period of supplemental security income benefits. *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

## I.  <u>PROCEDURAL HISTORY</u>

On April 11, 2001, Watson filed a claim for supplemental security income benefits, claiming disability as of July 1, 1997[1] due to knee and lower back problems, a torn right rotator cuff (and his resulting inability to "lift items" or "swing a hammer"), and depression.  R. 81-83, 99, 116.  Watson has also complained of chronic obstructive pulmonary disease, bipolar disorder, and post-traumatic stress disorder.  R. 27-29.  His claim was denied initially and upon reconsideration.  R. 64, 68.  On

_____

[1]In his application for benefits, Watson claims disability as of July 1, 1997.  R. 81.  In his Disability Adult Report, Watson claimed that he became unable to work because of his condition on February, 14, 1997, the day he stopped working.  R. 99.  The ALJ used the alleged onset date of July 1, 1997.  R. 13.

September 24, 2003, the Honorable James R. Ciaravino, Administrative Law Judge ["ALJ"], held a thirty-five-minute hearing on Watson's claim in Orlando, Florida.  R. 22-61.  Attorney Richard A. Schwartz represented Watson at the hearing.  R. 22.  The ALJ heard testimony from Watson.  R. 23.

On March 30, 2004, the ALJ issued a decision that Watson was not disabled and not entitled to benefits.  R. 12-20.  Following a review of the medical and other record evidence, the ALJ found that Watson could not perform his past relevant work as a carpenter, shrimp boat captain, and electrician.  R. 12, 20, Finding 6.  The ALJ found that Watson nevertheless retained the residual functional capacity ["RFC"] to perform the full range of the physical exertional requirements of medium work.  R. 20, Finding 10.  Applying the Medical-Vocational Guidelines, the ALJ concluded that Watson was not disabled.  R. 20, Finding 11.

After considering additional medical records, R. 277-89, the Appeals Council denied review.  R. 4-7.  On November 3, 2005, Watson timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 at 1, ¶ 4.  On May 23, 2006, Watson filed in this Court a memorandum of law in support of his appeal.  Docket No. 16.  On July 24, 2006, the Commissioner filed a memorandum in support of her decision that Watson was not disabled.  Docket No. 19.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Watson assigns one main error to the Commissioner.  Watson claims that the Commissioner erred by failed to meet her burden of proving that Watson could perform other work in the national economy.  Docket No. 16 at 1.  More specifically, Watson argues that the Commissioner erred by failing to consult a vocational expert in light of Watson's limited ability to push and pull and reach

overhead, and his mental impairment.  *Id.* at 5-7.  Watson also claims that the Commissioner should have consulted a vocational expert in light of the evidence submitted to the Appeals Council regarding Watson's mental impairment.  *Id.* at 7-9.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that testimony from a vocational expert was unnecessary because Watson's non-exertional impairments were not severe.  Docket No. 19 at 5-6.  More specifically, the Commissioner argues that Watson was not limited in his ability to push and pull, and that Watson had only a mild mental impairment that was caused by alcohol and substance abuse.  *Id.* at 8-9.  The Commissioner further counters that the evidence submitted to the Appeals Council does not meet the criteria for remand pursuant to sentence six of 42 U.S.C. 405(g).  *Id.* at 10-12.

**III.    THE STANDARD OF REVIEW**

    **A.    AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the

reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.      REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835,

840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1

(11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

─────────────────

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an

**D.     STANDARD OF REVIEW WHERE APPEALS COUNCIL CONSIDERS NEW EVIDENCE**

After the ALJ's decision — but before the Appeals Council decision — Watson submitted additional medical records covering from May 4, 2002 through January 19, 2005.  R. 277-89.  If a claimant submits evidence that does not relate to the relevant period under consideration, "the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [his or her] right to file a new application."  20 C.F.R. § 404.976(b)(1)(2005).  The Appeals Council did not return the additional evidence to the claimant.  Rather, the Appeals Council properly made the evidence a part of the record, and also considered the evidence in denying review.  R. 4-7.  The district court also must consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405(g).  Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review,  the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405(g).  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord*, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983); *Williams v. Comm'r of Soc. Sec.*, 407 F. Supp. 2d 1297, 1302-03 (M.D. Fla. 2005) (Appeals Council's denial is a final decision of the Commissioner that is subject to judicial review under section 405(g).   The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if

---

extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits.  *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

the ALJ's action, findings, or conclusions are not supported by substantial evidence.  20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. *Sims*, 120 S.Ct. at 2086.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's  review is similarly broad.  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000).  The Appeals Council, not the claimant, has the primary responsibility for identifying and developing the issues.  *Sims*, 120 S.Ct. at 2086.  When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review.  20 C.F.R. §§ 404.970(b); 416.1470(b); *Sims*, 120 S.Ct. at 2086;  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence and then denies review.  *Keeton*, 21 F.3d at 1066.  Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a decision of the Appeals Council.  *Keeton*, 21 F.3d at 1066.

The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision.  *Sims*, 120 S.Ct. at 2086;  *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1998).  When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's decision* is supported by substantial evidence.  *Falge*, 150 F.3d at 1323; *accord, Eads v. Sec'y of Health and Human Services*,

983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him).  Nevertheless, there is an important difference between *Falge* and this case — a difference stressed by the United States Court of Appeals for the Eleventh Circuit.  In *Falge*, the claimant did not appeal the Appeals Council's decision to deny review.  Instead he appealed only the *ALJ's decision* to deny benefits. 150 F.3d at 1324.  In this case, however, the claimant does expressly appeal and seek a reversal of the Appeals Council's decision to deny review.  Docket No. 1 at 1, ¶ 2.  The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review.  *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066; *accord, Higgenbotham v. Barnhart*, 405 F.3d 332, 337-38 (5th Cir. 2005); *Williams*, 407 F. Supp. 2d at 1303.

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies.  When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error.  *Sims*, 120 S.Ct. at 2086; *Keeton*, 21 F.3d at 1066.  Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error.  *See Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently

of record).  The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies.  The Appeals Council has considered claimant's additional evidence in light of the issues raised in the request for review, has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's findings are supported by substantial evidence.  The Appeals Council's determination is subject to judicial review.  The Commissioner cannot avoid judicial review of the Appeals Council's final decision by passing a regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review."  *See Sims*, 120 S.Ct. at 2086; *accord, Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405(g)); *Williams*, 407 F. Supp. 2d at 1302-03.

## IV.   **THE LAW**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the

-10-

claimant unable to do his or her previous work, or any other substantial gainful activity which exists

in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.       DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438

(11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner

also has a duty to notify a claimant of the statutory right to retained counsel at the social security

hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662

F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the

right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d

at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's

obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931,

934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special

duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all

the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts

and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### B.       THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520,

416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R.

§ 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments

which significantly limit his or her physical or mental ability to do basic work activities, then she does

not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's

impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she

is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her

from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's

impairments (considering his or her residual functional capacity, age, education, and past work)

prevent him or her from doing other work that exists in the national economy, then claimant is

disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe,

the ALJ must consider the combined effect of all of the claimant's impairments, and must consider

any medically severe combination of impairments throughout the disability determination process.

42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in

the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534

(11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has

considered all alleged impairments, both individually and in combination, and must make specific and

well-articulated findings as to the effect of a combination of impairments when determining whether

an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985

F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the

ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social

Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to

establish an impairment that meets the Listings, the claimant must prove an inability to perform the

claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"]. This assessment measures whether a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

## C.   OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the

national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).  Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th

-14-

Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.   TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's

impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing

court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.

*Foote,* 67 F.3d at 1561-62; *Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988);

*Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

###    H.    THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment. Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning; concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work). A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to

-20-

resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Some individuals may actually have worked during the period of time pertinent to the determination of disability. Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not

adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.  These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

## V.   APPLICATION AND ANALYSIS

### A.   THE FACTS

Watson was born on August 12, 1950, and was fifty-three years old on the date of the ALJ's decision to deny benefits.  R. 18, 81.  Watson has past work experience as a commercial shrimp boat captain and a carpenter.  R. 100.  Watson reported sporadic earnings through 1995, and no earnings from 1996 through 2001.  R. 93.  At the hearing, however, Watson stated that he last worked as a carpenter in 2000.  R. 41.  Watson claims disability as of July 1, 1997, due to knee and lower back problems, a torn right rotator cuff, chronic obstructive pulmonary disease, depression, bipolar disorder, and post-traumatic stress disorder.  R. 27-29, 81-83, 99, 116.

On May 13, 1998, a law enforcement officer found Watson unconscious.  R. 152.  When emergency medical services woke Watson, he stated that he had taken heroin and other substances, and that he did not wish to go to the hospital.  *Id.*  Watson was involuntarily admitted to Memorial Hospital under the Baker Act.  *Id.*  At the hospital, Watson admitted that he drank twelve beers; smoked marijuana; and used Valium, cocaine, and opiates.  R. 140, 158.  He had two black eyes, and wore knee braces.  R. 144.  While at the hospital, Watson was alert and cooperative.  R. 148.  The doctors diagnosed drug and alcohol abuse, and torn cartilage in Watson's right knee.  R. 146.  Watson stayed at the hospital until May 16, 1998 for detoxification.  R. 135, 146.

Watson filed his application for supplemental security income benefits on April 11, 2001.  R. 81-83.  On July 18, 2001, at the request of the Office of Disability Determinations, William Gilmer, M.D., examined Watson.  R. 159-63.  Watson told Dr. Gilmer that he had not worked since 1995 due to chronic pain in his right shoulder, both knees, and his lumbar area.  R. 159.  Watson also stated that

each day, he takes eight to ten aspirin and Celebrex, and smokes six to eight marijuana cigarettes to help with his pain.  R. 159.  Watson told the doctor that he smokes one pack of cigarettes and drinks two to three beers per day, and that he "does some martial arts exercise program."  R. 160.

Dr. Gilmer conducted a physical examination in which he noted mostly normal results.  R. 160-61.  In his upper extremities, Watson had some limited range of motion, as well as mild generalized tenderness with no focal tenderness.  R. 161.  He could "abduct his right shoulder to ninety degrees, but no further."  *Id.*  His right knee was normal, and Watson could walk without assistance.  R. 161-52.  X-rays of his right shoulder, right knee, and lumbar spin were mostly normal, with some "minimal narrowing of the disc space" at L4-L5 and L5-S1.  R. 162.  The doctor's impressions were:  chronic right shoulder, right knee, and lumbar pain syndrome; lumbar degenerative disc disease; tobacco and alcohol abuse; and a history of heroin overdose.  *Id.*

On August 6, 2001, a non-examining state agency physician completed a physical RFC assessment of Watson.  R. 165-72.  The physician opined that Watson could lift and carry fifty pounds occasionally and twenty-five pounds frequently; and sit and/or walk for approximately six hours in an eight-hour workday.  R. 166.  He also opined that Watson was limited in his upper extremities, and wrote "occas. use [indecipherable]" next to his opinion.  *Id.*  Watson could occasionally climb and crawl, and frequently balance, stoop, kneel, and crouch.  R. 167.  He was also limited to occasionally reaching (particularly overhead) with his right arm, but could reach in all directions with his left arm.  R. 168.  He had no visual, communicative, or environmental limitations, except that he had to avoid concentrated exposure to hazards such as machinery and heights.  R. 169.

-24-

On December 26, 2001, Hugh Coleman, D.O., evaluated Watson at the request of the Office of Disability Determinations. R. 173-77. Watson complained of right shoulder and knee pain, low back pain, and depression. R. 173. He stated that his shoulder pain increased when reaching for objects or when rolling over in bed, and that he could not reach over his head or brush his hair with the right arm. R. 173-74. He told the doctor that he could not work due to pain, but also stated was able to do some activities of daily living. R. 174. He denied having suicidal thoughts, but reported being depressed due to his inability to work for the previous three or four years. R. 175. A physical examination revealed mainly normal results. R. 175-76. Watson had full range of motion of his lower extremities, and some limited range of motion in his upper right extremity. R. 176. The doctor assessed "limited range of motion of the right shoulder," right shoulder, low back pain, and bilateral knee pain with crepitus, and suspected underlying osteoarthritis. R. 177.

A second non-examining state agency physician assessed Watson's physical RFC on January 8, 2002. R. 178-85. The physician opined that Watson could lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk, and/or sit for six hours in an eight-hour workday; and push and pull without limitation. R. 179. He opined that Watson could occasionally climb, balance, stoop, kneel, crouch, and crawl. R. 180. Watson was limited in reaching overhead with his right arm, but otherwise had no other manipulative limitations. R. 181. He further had no visual, communicative, or environmental limitations. R. 181-82.

On February 8, 2002, at the request of the Office of Disability Determinations, clinical psychologist Malcolm J. Graham, Ph.D, completed a General Clinical Evaluation with Mental Status. Watson told Dr. Graham that both of his parents were alcoholics; that his mother died of alcoholism;

and that he was sexually abused by his father. R. 186. He also reported hurting his right shoulder in

1995 when he was electrocuted. *Id.* Watson stated that he had never sought treatment with a "mental

health professional," and denied being suicidal. R. 187. He further stated that he used to be a

"chronic alcoholic," and that he "has to have a couple of drinks in the morning to hold a cup of

coffee." *Id.* He told Dr. Graham that he smokes five or six marijuana cigarettes each day in order to

alleviate his pain. *Id.* Dr. Graham observed no depressed or anxious mood, and stated that Watson

could "relate information in a rational, coherent, and sequential fashion." R. 187. Dr. Graham

diagnosed "Polysubstance dependence with a present preference for alcohol and marijuana" on Axis

I[3]; anti-social personality disorder on Axis II; pain in his right shoulder and knees "by report" on Axis

III; "vocational problems" on Axis IV; and a current Global Assessment of Functioning ["GAF"] of

65 - 76, with a "Highest GAF [in the] Past Year" of 65-75 on Axis V.[4] R. 188. Dr. Graham stated

that Watson's prognosis was "[g]uarded to poor because of his chronic substance abuse." *Id.*

---

[3]The DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"] describes the five axes included in "the DSM-IV multiaxial classification" as:

Axis I    Clinical Disorders; Other Conditions That May Be a Focus of Clinical Attention
Axis II   Personality Disorders
Axis III  General Medical Conditions
Axis IV   Psychosocial and Environmental Problems
Axis V    Global Assessment of Functioning.

DSM-IV at 25.

[4]The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. DSM-IV at 32. A GAF code of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household). *Id.* In general, a person with this score is functioning "pretty well" and "has some meaningful interpersonal relationships. *Id.* A GAF code of 71 to 80 is better — the individual has, if symptoms are present, transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument), and slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork.). *Id.*

Dr. Graham also assessed Watson's functional abilities, opining that Watson had no problems in his attention or concentration span and remote memory. R. 189. He stated that Watson had no "behavioral indications" of anxiety, depression, or thought disorder. The doctor noted a long history of substance abuse and dependence, and stated that "[a]mazingly, [Watson] states he has never been in a treatment program." *Id.* The doctor further noted that Watson had been arrested fifty times "for alcohol or marijuana-related issues" and for "violence," and that "[a]mazingly, [Watson] also states that he has never been convicted of a felony. *Id.* Dr. Graham also stated that Watson "spends most of his day watching TV, taking care of his girlfriend, or going fishing." *Id.*

On February 22, 2002, a non-examining state agency consultant completed a Psychiatric Review Technique Form assessing Watson's mental impairments. R. 190-203. The consultant opined that Watson had personality and substance addiction disorders, but that his mental impairments were not "severe." R. 190, 198. The consultant opined that Watson had "mild" restrictions in his activities of daily living; mild difficulties maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation. R. 200. In handwritten notes, the consultant concluded that: "[d]espite [Watson's] substance abuse, mental status functions of reasoning, concentration and memory appear essentially preserved. He appears capable of appropriate social interaction. Daily adaptive skills are normal." R. 202. In the checklist form, the consultant checked the box stating that Watson had "Coexisting Nonmental Impairment(s) that Requires Referral to Another Medical Specialty." R. 190.

Watson submitted treatment notes from the Volusia County Health Department clinic ["the Clinic"] covering the period from February 2002 through October 12, 2002. R. 216-29. The

-27-

handwritten "Progress Notes" are difficult to decipher, but it appears that Watson went to the clinic once a month, mostly for refills of his prescribed medication, including Lithium, Soma, and Robaxin (muscle relaxant).  *See id.*  During his visits to the Clinic, Watson admitted that he was smoking marijuana.  *See* R. 223.  A June 3, 2002  Diagnostic Imaging Report (ordered by the Clinic) revealed "moderate degenerative change" in his right shoulder.  R. 226.  In another Diagnostic Imaging Report (also dated June 3, 2002), the doctor's impression was mild to moderate osteoarthritis in his left knee, moderate osteoarthritis of the right knee, chondral calcinosis of the right knee, and the possibility of spontaneous osteonecrosis of the left knee.  R. 228.

On June 27, 2002, Watson went to the Clinic, and requested a referral to psychiatrist.  R. 223. On two occasions in August 2002, the doctor wrote in the Progress Notes: "manic-depression, osteoarthritis, hypertension."  R. 217, 218.

It is not clear from the record whether the Clinic referred Watson to a psychiatrist as requested, although Watson began visiting The House Next Door for therapy in July 2002.  R. 213.  In July and August 2002, Watson visited The House Next Door approximately eight times.  R. 211-15.  On July 24, 2002, Melanie Naffke, a registered nurse practitioner working with The House Next Door, evaluated Watson upon referral from his counselor at The House Next Door.  R. 214-15; *see also* R. 211.  Watson complained of insomnia, irritability, and mood swings.  R. 214.  He told Naffke that he was sexually abused as a child, that he has osteoarthritis, and that he had been exposed to asbestos. *Id.*  He also told the nurse that a doctor "had told him he has 5 years to live, which has also been stressful for him."  *Id.*  He further reported that he drinks a twelve-pack of beer each week, and that he smokes marijuana on a regular basis.  *Id.*

-28-

Naffke observed that Watson had "racing thoughts" and was "easily distracted," but that his "thought content is coherent." *Id.* His insight and judgment were "fair." *Id.* Naffke's impression was: bipolar disorder, hypomanic without psychotic features, on Axis I; "Deferred" on Axis II; a history of asbestos and osteoarthritis at Axis III; and psychological stresses, including financial difficulties and unemployment at Axis IV. R. 215. Naffke did not assign Waston a GAF score at Axis V. *See id.* Naffke recommended that Watson continue his therapy sessions with his counselor at The House Next Door, as well as medications, including Depakote (for treatment of bipolar disorder) and Trazodone (for treatment of depression and anxiety); and noted that Watson "could benefit from a mood stabilizer." *Id.*

On August 8, 2002, Watson's partner took Watson to the Florida Hospital emergency room. R. 204-08. His partner stated that Watson went to therapy that day, and became agitated, confused, and incoherent during therapy. R. 206. She also reported that Watson kept saying "just break my arm." At the hospital, Watson was trembling, incoherent, and kept yelling "just break my arm." R. 204-05, 208. He was also agitated, kept "throwing his hands and fists", and fought with the nurses and staff. R. 204-05. The hospital staff sedated Watson, and the doctor's impression was "[a]cute change in mental status of uncertain etiology," cannabis abuse, and a history of post traumatic stress disorder. R. 206. Watson was discharged the same day and transferred to Fish Memorial Hospital for a CT scan. R. 206-07. The August 8, 2002 CT scan of Watson's brain was unremarkable, and showed only "mild" sinus disease. R. 220.

In September 2002, Bryce Laraway, Watson's counselor from The House Next Door, sent two letters to Watson's attorney (who represented him at the ALJ hearing). Laraway, a Marriage and

-29-

Family Therapist Student Intern, stated that Watson underwent therapy sessions for depression, anxiety, and post-traumatic stress disorder (as a result of serving in the Vietnam War).  R. 211-12. According to Laraway, Watson's symptoms related to these mental disorders "have been long standing and he is having increased difficulty dealing with them at this time."  R. 211.  Laraway added that Watson's "symptoms also have the effect of exacerbating his somatic problems and thereby negatively effecting his ability to cope with stressful situations."  *Id.*

On September 24, 2002, Watson testified at the ALJ hearing.  R. 23-61.  During the hearing Watson interrupted his attorney and the ALJ a number of times.  *See* R. 27, 30, 34, 37, 43, 59.  Watson testified that he lives with and takes care of his partner who is disabled and receives disability benefits due to multiple sclerosis.  R. 35-36.  He testified that he has pain in his hip, knee, and back that causes him to be unable to sit "for any period of time."  R. 43.  He also stated that he has pain in his right shoulder, and that he cannot lift his right arm over his shoulder.  R. 41-42.  Watson further testified that he has mood swings everyday that "go from being congenial and bright . . . to total like [sic] a raving lunatic."  R. 38, 47.  He stated that his medications do not work, and that he "got to the point where [he] was doubling up on [his] Lithium."  R. 48.  He admitted using marijuana.  R. 51-52. Watson stated that marijuana helped his pain.  R. 52.  Watson also admitted drinking alcohol.  R. 52-54.

At the hearing, Watson's counsel also argued that Watson had chronic obstructive pulmonary disease, and informed the ALJ that Watson has filed a class action claim for asbestosis.  R. 29. Watson interrupted to tell the ALJ: "I'm dying, sir."  *Id.*  The ALJ told Watson and his counsel that

he would order further psychological evaluations and other medical tests, particularly an evaluation of Watson's claimed chronic obstructive pulmonary disease.  R. 30, 54.

At the request of the Office of Disability Determinations, Bruce Borkosky, Psy.D., completed a psychological evaluation of Watson on December 10, 2003.  R. 247-59.  Watson described his medical and personal history, and admitted a history of problems with alcohol and drug abuse.  R. 247-48.  Dr. Borkosky interviewed Watson, and gave him a series of clinical tests to determine Watson's mental status.  *See* R. 248-56.  Dr. Borkosky's impression was adjustment disorder and polysubstance dependence on Axis I, and personality disorder on Axis II.  R. 255.  He also stated that Watson needed group and couples psychotherapy, as well as pain management, and that Watson's prognosis was "fair."  *Id.*  The psychiatrist further stated:

> In terms of functional ability, [Watson] had a good ability to understand, a good ability to remember and carry out instructions, and a fair ability to respond appropriately to supervision, coworkers and work pressures.  This evaluation is valid.  Should he be awarded benefits, he is capable of managing his own funds.

*Id.*

On January 1, 2004, Dr. Borkosky also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)."  R. 258-59.  He opined that Watson had "slight"[5] restrictions in his abilities to: understand and remember short, simple instructions; carry out short, simple instructions; understand and remember detailed instructions; make judgments on simple, work-related decisions; interact appropriately with the public, supervisors, and co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work

---

[5]The questionnaire defined "slight" as "some mild limitations in this area, but the individual can generally function well."  R. 258.

setting.  R. 258-59.  He also opined that alcohol and/or substance abuse contributed to all of these restrictions on Watson's abilities, and that Watson would be "better" if he did not abuse alcohol and drugs.  R. 259.  He further stated that Watson would be unable to manage disability benefits in his own best interest "due to drug abuse."  *Id.*

On January 10, 2004, Brad Warrick, M.D. evaluated Watson for osteoarthritis, alcohol disorder, bipolar disorder, posttraumatic stress disorder, and asbestosis (at the request of the Office of Disability Determinations).  R. 260-64.  Dr. Warrick noted that Watson smelled like alcohol, and ambulated without difficulty.  R. 262.  Watson displayed some limited range of motion in his upper extremities, and he was somewhat "manic and expresse[d] paranoid thoughts."  R. 263.  He was able to follow simple directions, and his judgment "appear[ed] to be intact."  *Id.*  He showed no deficits in sitting, standing, walking, hearing, speaking or handling objects.  R. 264.  Dr. Warrick observed Watson performing multiple "martial arts maneuvers," and Watson told the doctor that he worked as a "bouncer at a barker [sic] bar in town and teaches martial arts three times a week."  R. 261.

The physical examination revealed normal results, "with the exception of some decrease[d] range of motion of the shoulders bilaterally."  *Id.*  Dr. Warrick observed no shortness of breath "as [Watson] was observed to talk nonstop in a tangential manner for 30 minutes straight during the exam."  *Id.*  The doctor stated that Watson was non-compliant with his medication for bipolar disorder and post-traumatic stress disorder "by his own account," and that Watson was "very honest about" his substance abuse and "feels no need to seek treatment at this time."  *Id.*  Dr. Warrick also performed Spirometric Pulmonary Function tests, and concluded that Watson was not suffering from an acute respiratory illness.  R. 265-69.

Dr. Warrick also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" on January 11, 2004.  R. 270-73.  The doctor opined that Watson's impairments had no effect on his abilities to lift, carry, stand, walk, or sit.  R. 270-71.  He did opine, however, that Watson's impairments affected his ability to push and pull, and that Watson was limited in his upper extremities.  R. 271.  The doctor further explained that Watson had some decreased range of motion in his right shoulder, and that "[l]ifting overhead, pushing may exacerbate. [sic]" *Id.*  Watson had no other significant postural, visual, communicative, and environmental limitations, and he had no manipulative limitations, except that he was limited in his ability to reach overhead.  R. 271-73.

### 1.    Evidence Submitted to the Appeals Council

After the ALJ's March 30, 2004 decision —  but before the Appeals Council decision — Watson submitted additional medical records (R. 277-89), including a May 4, 2002 list of his medications from the Volusia County Health Department.  R. 278.  The list shows fourteen medications including, *inter alia*, Motrin, Naprosyn, Trazadore, Depakote, Lithium, Soma, and Flexeril.  *Id.*

Watson also submitted more Progress Notes from the Volusia County Health Department clinic from March through October 2003.[6]  R. 279-81.  During his visits, Watson complained of pain and complained that the Lithium was "not working."  R. 279-80.  On March 19, 2003, Watson admitted occasionally drinking and smoking marijuana.  R. 280.  He missed two appointments on March 31, 2003 and September 28, 2003.  *Id.*  On October 19, 2003, the doctor assessed hypertension, osteoarthritis, and a history of manic depression.  From the Progress Notes, it appears that Watson had

---

[6]Like the progress notes from the Volusia County Health Department summarized above, the March and October 2003 notes are handwritten and difficult to read.

also been receiving treatment at the ACT Corporation, but that Watson had not visited the ACT Corporation "for some time." *See* R. 280; *see also* R. 279 (stating that Watson "will need to get back to ACT before getting his Lithium" and that Watson "needs to go back to ACT").

Watson also submitted to the Appeals Council records relating to the period after the March 30, 2004, ALJ's decision. Watson submitted a Medication Record from the ACT Corporation, a "Physician Services Clinic Status Report" dated January 19, 2005 from the ACT Corporation, a "Psychiatrist/ARNP Status Report" dated January 19, 2005, and a January 26, 2005 Mental Residual Functional Capacity Assessment form signed by Dr. Robert Deeb, M.D.  R. 283-89.  The Medication Record from the ACT Corporation (which is undated) indicates that Watson received Depakote medication refills from the ACT Corporation on May 17, 2004, July 26, 2004, October 25, 2004, and January 19, 2005.  R. 289.  Watson received a Zyprexa medication refill on October 25, 2004, and January 19, 2005.  *Id.*

The January 19, 2005 "Physician Services Clinic Status Report" is signed by two people, but neither signature is legible.  *See* R. 288.  The Report shows that "Watson aka Mike" was in the "Doctor only" program at the ACT Corporation.  *Id.*  The notes in the Report state:

> His lady friend is one of my clients . . . She has remarked that his moods have improved tremendously and he is drinking less. Major concern is excessive weight gain. Can you recommend any alternative for this?

*Id.* The January 19, 2005 "Psychiatrist/ARNP Status Report" does not clearly indicate the doctor who prepared the report, although it appears to bear the same signature as the January 26, 2005 "Mental

-34-

Residual Functional Capacity Assessment" form signed by Robert Deeb, M.D.[7] *Compare* R. 285 *with*

R. 287.  In the Psychiatrist/ARNP Status Report, the doctor states that he treats Watson's partner for

multiple sclerosis, and that the doctor is  "getting to know [Watson] better." R. 287.  The doctor notes

that Watson had gained eighteen pounds in three months, and that "he has really done well on

Depakote." *Id.*  The doctor diagnosed bipolar disorder, MRE manic, and assigned a GAF score of 50.[8]

*Id.*  The doctor indicated that this diagnosis was not "a change in the diagnosis," and recommended

continued treatment with Depakote. *Id.*  The doctor also indicated that "[m]edical psychotherapy and

medication management [were] provided," and that medication education and compliance were

discussed with Watson. *Id.*  The doctor further recommended a follow-up visit in three months. *Id.*

Dr. Deeb assessed Watson's mental RFC as of January 26, 2005.  R. 283-86 (the assessment

was a "Current Evaluation").  Dr. Deeb completed the checklist Mental Residual Functional Capacity

Assessment form as to Watson's mental impairments, but did not include any other remarks or

explanations.  *Id.*  Dr. Deeb opined that Watson was "markedly limited" in his abilities to: 1.)

complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods; 2.) interact appropriately with the general public; and 3.) set realistic goals or make plans

independently of others. R. 284.  Watson was "moderately limited" in his abilities to: 1.) understand

---

[7] Watson's memorandum of law in support of his appeal (filed in this Court) and his Memorandum to the Appeals Council (submitted to the Appeals Council on April 25, 2004) do not state the name of the doctors who prepared the January 19, 2005 reports, and fail to explain the significance of these ACT Corporation records to the relevant period. *See* R. 274-76; *see also* Docket No. 16.

[8] A GAF code of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)., or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-IV at 32.

and remember detailed instructions; 2.) ability to carry out detailed instructions; 3.) maintain attention and concentration for extended periods; 4.) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 5.) sustain an ordinary routine without special supervision; 6.) work in coordination with or proximity to others without being distracted by them, 7.) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 8.) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and 9.) respond appropriately to changes in the work setting.  R. 283-84.

## B.    THE ANALYSIS

Watson argues that the ALJ erred by exclusively relying on the grids in light of Watson's limitations of his abilities to push and pull (as articulated by Dr. Warrick) and his mental impairment. Docket No. 16 at 5-7.  The Commissioner counters that exclusive reliance on the grids was proper because Watson was not limited in his abilities to push and pull, and because Watson's mental impairment was mild and due to alcohol and substance abuse.  Docket No. 19 at 5-9.

Exclusive reliance on the grids is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level, or when a claimant has a non-exertional impairment that significantly limits basic work skills.[9]  The ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.  A non-exertional impairment is any impairment that does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull.  Social Security Ruling 83-10.  Watson is correct that remand is required.

---

[9] Social Security Ruling 83-10 defines "full range of work" as all or substantially all occupations existing at a given exertional level.  SSR 83-10.

1.    Watson's Ability to Push and Pull

Watson first argues that, despite Dr. Warrick's opinion, the ALJ "did not seem to consider how [Watson's] limitations in pushing and pulling and reaching overhead would affect his ability to perform all types of work in the national economy." Docket No. 16 at 6. The ALJ must state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz*, 825 F.2d at 279. Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson*, 755 F.2d at 786.

In this case, the ALJ found that Watson retained the RFC to lift fifty pounds occasionally; lift and carry twenty-five pounds frequently; and stand, walk, or sit for six hours or more in an eight-hour workday. R. 18. In making his RFC finding, the ALJ stated: "[t]his finding is consistent with that of the first state agency [non-examining] physician and incorporates the opinion of the third consultative physical examiner." R. 18. In the body of his decision, the ALJ did not specifically mention Watson's ability to push and pull or reach overhead, although, in his numbered "Findings," the ALJ found that Watson retained the RFC to perform the full range of the physical exertional requirements of medium work.[10] R. 20, Finding 10.

---

[10]20 C.F.R. § 404.1567 states that:

Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

20 C.F.R. § 404.1567(c). The regulation further provides that "light work":

involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range

In reviewing the medical evidence, the ALJ referred to Dr. Warrick as "the third consulting physician," and summarized Dr. Warrick's "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" dated January 11, 2004. *See* R. 17; *see also* R. 270-73. The ALJ noted that, in this medical source statement, Dr. Warrick "opined [Watson] was physically limited only in pushing or pulling with his upper extremities and in reaching overhead." R. 17.

In his January 2004 examination notes, Dr. Warrick found that Watson's impairments affected his ability to push and pull, and that Watson was limited in his upper extremities. R. 271. The doctor further explained that Watson had some decreased range of motion in his right shoulder, and that "[l]ifting overhead, pushing may exacerbate. [sic]" *Id.* The ALJ never stated why he rejected Dr. Warrick's opinions, yet also purported to incorporate those opinions. The ALJ thus failed to state with particularity the weight he assigned to Dr. Warrick's opinion regarding Watson's ability to push, pull, and lift overhead.

In fact, other than stating the ALJ's RFC finding is consistent with the opinions of the "first" non-examining state agency physician and that the ALJ "incorporate[d]" Dr. Warrick's opinions, the ALJ did not specifically state the weight he assigned to any other doctors' opinions. Dr. Gilmer, a consultative examiner, noted that Watson had some limited range of motion, and that Watson could "abduct his right shoulder to ninety degrees, but no further." R. 161. Dr. Coleman, another consultative examiner, assessed "limited range of motion of the right shoulder," right shoulder, low back pain, and bilateral knee pain with crepitus, and suspected underlying osteoarthritis. R. 177. The

---

of light work, you must have the ability to do substantially all of these activities.

ALJ thus failed to explain why Watson was still able to perform the *full range* of medium work in light of the limitations found by the doctors.

2.   <u>Watson's Mental Impairment</u>

Watson also argues that the ALJ should have considered his mental impairment in determining his RFC, and should not have disregarded his mental impairment as "not severe."  Docket No. 16 at 5 - 7.  Watson argues that his mental impairment is more than just a slight abnormality, and has more than just a minimal effect on his general ability to work.  *Id.* at 7.  Absent vocational testimony, Watson argues that the Commissioner failed to prove that jobs exist in the national economy that a person with Watson's mental impairment can perform.  *Id.* at 15 - 16.

Indeed, the ALJ found Watson's mental impairment to be both "severe" and "not severe." According to the ALJ, the medical evidence indicates that Watson has "polysubstance abuse disorder, and adjustment disorder, and an unspecified personality disorder, bipolar disorder, impairments that are 'severe' within the meaning of the Regulations . . ."[11]  R. 16 - 17.  Nevertheless, noting that consultative psychologists found only mild and slight restrictions, the ALJ concluded that Watson's mental disorders, polysubstance abuse, Adjustment Disorder and Personality Disorder are not severe.[12]

---

[11]Watson does not contend that his mental impairment meets or equals the Listings.

[12]Specifically, the ALJ found that Watson's "mental impairments impose slight restrictions on his activities of daily living, slight difficulties in maintaining social functioning and slight difficulties maintaining concentration, persistent, or pace . . ."  R. 18.  In his numbered "Findings," R. 19, the ALJ found that Watson's:

> right shoulder osteoarthritis was "severe" based on the requirements in the Regulations 20 CFR § 416.920(b). [Watson's] mental condition diagnosed as Adjustment Disorder and Personality Disorder are not shown to be severe.  [Watson's] drug and alcohol abuse contributes to his limitations and he needs to be treated for this abuse according to a consulting psychologist.  Nevertheless, [Watson] retains the mental capacity to understand, remember and carry out instructions and a fair ability to respond appropriately to supervision, coworkers and work pressures . . . Accordingly, his mental disorders and polysubstance abuse is considered "not severe."

R. 19, Finding 2.  Although the ALJ found that Watson's mental condition was "not severe," he found that Watson's drug and alcohol abuse "contributes" to his limitations.[13]  Remand will permit the ALJ to make a specific and consistent finding as to whether Watson's non-exertional mental limitation was severe enough to preclude a wide range of medium work, and to consult a Vocational Expert on that subject.

Watson also argues that the Commissioner erred by failing to consider the evidence submitted to the Appeals Council on Watson's mental impairment.  Docket No. 16 at 7-9.  Watson notes Dr. Deeb's opinion that Watson had numerous marked or moderate limitations due to his mental impairments.  The Commissioner counters that the evidence submitted to the Appeals Council does not meet the criteria for remand pursuant to sentence six of 42 U.S.C. 405(g).[14]  Docket No. 19 at 10-12.  The Commissioner observes that Dr. Deeb's mental RFC assessment "concerns [Watson's] medical status ten months after the ALJ's March 30, 2004 decision." *Id.* at 11.  The Commissioner concedes that some of the additional evidence "may be material," but argues that "it could not reasonably have been expected to change the ALJ's decision." *Id.*  In light of the remand, the Court need not resolve this issue.

---

[13]The Commissioner argues that Watson is not disabled because "alcoholism or drug addiction would be a contributing factor material to the disability determination."  Docket No. 19 at 9.  It is true that Watson repeatedly admitted to using drugs or alcohol.  However, the ALJ never evaluated a drug and alcohol *addiction*, and never determined that the drug or alcoholism addiction was "a contributing factor material to the determination of disability" pursuant to 42 U.S.C. § 423.  *See also* C.F.R. § 416.935; SSR 82-60.

[14]The Appeals Council's denial of review is a *final decision* of the Commissioner that is subject to review under section 405(g).  *Williams*, 407 F. Supp. 2d at 1302-03 (emphasis added).  When evidence is submitted *only* to the Appeals Council, the case may be remanded under sentence four, and need not be evaluated under the three-prong standard for remand under sentence six *Id.* at 1303.  According to the Regulations, the Appeals Council *shall* evaluate the entire record, including the new and material evidence submitted if it relates to the period on or before the date of the ALJ's action.  20 C.F.R. § 404.970 (b).

## VI.    **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **REMANDED** pursuant to

sentence four of 42 U.S.C. § 405(g) for further proceedings not inconsistent with this opinion.  The

Clerk should enter a judgment and close the case.

**DONE AND ORDERED** this 19th day of March, 2007.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL            33602

The Honorable James R. Ciaravino
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817